**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARICA R. JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  10 C 3404** |
| | ) | |
| **v.** | ) | **Judge Joan H. Lefkow** |
| | ) | |
| **KOPPERS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**AMENDED OPINION AND ORDER**</u>

Marica Johnson filed suit against Koppers, Inc., alleging violations of Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.*, and 42 U.S.C. § 1981.  The

parties have filed cross motions for summary judgment.  For the following reasons, Koppers's

motion [#47] will be granted and Johnson's motion [#39] will be denied.[1]

**BACKGROUND**[2]

**I.      Koppers and the Relevant Workplace Policies**

Koppers is a chemical company that manufactures carbon compounds and commercial

wood treatment products.  The union employees in Koppers's plant in Stickney, Illinois are

predominantly male.  Out of eighty-seven employees, fewer than ten were women during the

time period relevant to Johnson's claims.  Approximately forty percent of the employees at the

Stickney plant were African-American, and approximately fifty percent were white.

---

[1] This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).  Venue is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b) because the alleged unlawful employment practice occurred in this district.

[2] The facts set forth in this section are derived from the statements of fact and supporting documents submitted by the parties to the extent they are relevant, supported by admissible evidence, and comport with Local Rule 56.1.  They are taken in the light most favorable to Johnson.

Koppers's General Rules of Conduct state that employees shall "[r]efrain[] from behavior or conduct deemed offensive or undesirable, or which is contrary to the Company's best interests." (Def.'s Ex. F at KI0000165.) The rules prohibit "[t]he use of abusive or inappropriate, obscene or offensive language;" "[d]isorderly conduct, including assault on another employee or customer, fighting at work, swearing, shouting, threatening behavior and other actions of an offensive nature;" and "[t]hreatening or intimidating co-workers, security guards, customers, or guests." (*Id.* at KI0000165–66.) Koppers's policy is to investigate all threats of violence and to take disciplinary action, including termination, if it determines that prohibited conduct occurred. (Def.'s Ex. G at KI0000170.) Koppers also has a written anti-harassment policy.

Neither the union contract nor Koppers's employee code of conduct documents mention progressive discipline.

## II.  Johnson's Employment History at Koppers

Marica Johnson is an African-American woman who was employed at Koppers's Stickney plant from 1995 until her termination on May 12, 2008. At the time of her termination Johnson was working as a lab technician, a position she had held since 2000, and she was supervised by Joseph Gerba. Johnson was proficient at her job.

Prior to May 2008, Johnson was disciplined five times. In December 1995, Johnson received a written warning because she had stayed on the clock after her work was finished. (Def.'s Ex. C.) In July 1999, Johnson was suspended without pay for ten workdays and received a written corrective action after the plant superintendent found her asleep at her desk in the

laboratory.  (Def.'s Ex. D.)  In August 2000, Johnson received a written warning letter because she had been observed smoking in the hourly lunch room.  (Def.'s Ex. E.)

Johnson was disciplined again, for fighting with a security guard, in November 2006. Johnson had gone to the guard shack to pick up food that she had ordered.  When the guard told Johnson not to take the food, she walked behind the guard's counter without authorization and grabbed it.  The guard touched Johnson, and she responded by pushing him and telling him that he "better keep his hands off [her]."  (Johnson Dep. at 111.)  Johnson also told the guard that she was going "bust [his] head."  (*Id.* at 112.)  Johnson testified that the guard then picked up a phone, and threatened "[w]e're going to get to busting."  (*Id.* at 116.)  Johnson was holding a stapler and she then threw it down towards the floor.  (*Id.* at 114–15.)  The incident was recorded on video.  The plant manager at the time, Gregory Traczek, investigated the incident and interviewed Johnson.  She was eventually suspended for ten days without pay and warned that "future such occurrences will be met with termination of employment."  (Def.'s Ex. J.)  The notice of suspension and final warning states, "While it is in question as to who made the initial physical contact, a plant surveillance camera video recording and accounts of the incident given by you and the security officer indicate that your actions only prolonged the situation and included a physical threat."  (*Id.*)  Johnson admits that this discipline was justified.

In July 2007, Johnson was disciplined because of an alleged altercation with Michael O'Connell, another lab technician.  O'Connell is a white male who worked in the same lab as Johnson, under the same supervisors.  He did not like Johnson.  From time to time, Johnson's and O'Connell's shifts overlapped.

The alleged altercation between O'Connell and Johnson took place on July 13, 2007, when Johnson was working in the lab with the radio on. O'Connell came in, turned down the volume, and turned on the air conditioner. Johnson asked O'Connell why he was "messing with stuff" because it "wasn't even his shift yet." (Johnson Dep. at 121.) According to Johnson, she and O'Connell had no further significant interaction. O'Connell, however, later told Richard Wagner, the plant manager at the time, that Johnson had said "old mother-fucker, I'll get you," and called him a "white motherfucker" and a "faggot insulin dick" (presumably a reference to the fact that O'Connell is diabetic).

Without interviewing Johnson, Wagner determined that both Johnson and O'Connell were at fault. After consulting with Traczek, Wagner decided that Johnson should be disciplined more severely than O'Connell because of her prior disciplines and because O'Connell's allegations of racial harassment, if true, warranted severe action. Wagner issued a written warning letter to Johnson, which states

> In the past few weeks you have exhibited disruptive behavior that has caused other employees to feel uncomfortable and intimidated. Your actions concern Koppers management especially since you have exhibited a propensity toward physical violence. This was recorded on [a] plant security video on 11/9/06 during your encounter with Louis Withers in the guard shack. At that time you were suspended for 10 days and given a "Final Warning" that a repeat of your actions "will be met with termination of employment at the Koppers Inc. Stickney Plant." Plant management has been notified by union employees that you exhibited offensive and intimidating language and behavior on a number of recent occasions. . . . .

> This behavior will not be allowed in the future and will result in discharge from Koppers.

(Dkt. #49-12.) O'Connell received a verbal warning letter, which was less severe than the written warning letter given to Johnson. Wagner's letter to O'Connell states in part, "Personality

conflicts between lab techs has [*sic*] resulted in a non-productive atmosphere in the lab.  Horse play, false accusations of others, verbal harassment, and any other type of disruptive behavior needs to stop immediately.  This disruptive action between you and other employees needs to stop before it escalates into physical violence."  (Dkt. #42-4.)

The United Steelworkers Union filed a grievance on Johnson's behalf, arguing that Johnson should not have received a written warning letter because Wagner did not interview Johnson before he disciplined her.  Pursuant to an agreement between the union representatives and Koppers's management, Johnson's written warning letter was reduced to a memo that summarized Johnson's work obligations and employment status.  (Dkt. #49-13, #49-14.) O'Connell's letter was also reduced to a memo, even though the union did not file a grievance on his behalf.

### III.    April 2008 Incident With O'Connell and Johnson's Termination

On April 28, 2008, Johnson and O'Connell got into another argument, the details of which are unclear.  During her deposition, Johnson had difficulty remembering the chronology of events.  O'Connell, on the other hand, refused to be deposed in this case and the parties have agreed that he will not be called as a witness at trial.  (*See* Dkt. #37.)  Therefore the court relies on Johnson's deposition testimony in recounting the events of April 28.  O'Connell's allegations (which Johnson denies) are relevant only insofar as they were reported to Koppers management and the police and provided the impetus for Johnson's termination.

On the afternoon of April 28, Johnson had stayed after the end of her shift to finish a distillation and test some samples.  O'Connell's shift had just begun.  At some point after O'Connell came into the lab, he told Tim Wright, an African-American co-worker, "tell her

[Johnson] to give me the log book." (Johnson Dep. at 163.) O'Connell soon became upset when he couldn't find the log book and started shouting, "I don't know where the book is, and she won't give me the book." (*Id.* at 165–66.) Johnson told O'Connell that he couldn't tell her what to do because he wasn't "the boss." (*Id.* at 168.) Johnson then left the lab with Xavier Kenyatta, the shift supervisor (also referred to as the tar foreman).

Sometime before or after this exchange, the lab phone rang. O'Connell answered the call and then asked Johnson whether the tank was "good." Johnson told him the tank was good and then asked who was on the phone. O'Connell asked her again whether the tank was good, and Johnson again asked who was on the phone. O'Connell slammed down the phone, said, "I'm tired of this shit," and then walked away.

At some other time that afternoon, Kenyatta called Johnson into his office to speak to the supervisor for the creosote tanks, who was on the phone. Johnson left the lab to go to Kenyatta's office. As Johnson was entering Kenyatta's office, O'Connell was exiting. Their shoulders brushed, and O'Connell said, "Excuse me." Johnson finished her work and left for the day.

After Johnson left the Stickney plant, O'Connell called the police and reported that Johnson had thrown a lab book and hit him in the face, harassed him, and pushed him into a wall outside of Kenyatta's office. Johnson was suspended from work the next day, pending Koppers's internal investigation of the incident.

Wagner investigated O'Connell's allegations. Wagner interviewed Johnson twice, as well as O'Connell, Kenyatta, Wright, and Sam Wells, a janitor who worked for Brothers Cleaning Services. Wagner also spoke with Gerba, Kevin Janda, who worked in the human resources department, and Traczek, who at that time was working as the carbon materials and

chemicals division operations manager, in Koppers's corporate office, and was Wagner's direct superior.

The only eyewitness to the alleged incident was Wells, who was cleaning the hallway outside Kenyatta's office and told Wagner that he saw Johnson deliberately push O'Connell. Wells showed Wagner the location where he was standing and Wagner was satisfied that Wells would have had a direct line of sight to Johnson and O'Connell. (Wagner Dep. at 122–23.) Kenyatta told Wagner that Johnson had been "totally insubordinate" and "out of control" on April 28 and that she should be terminated. (*Id.* at 145.)

Wright told Wagner that after Johnson had gone home, but before the police came, he saw several people in a meeting, including Wells, O'Connell, Kenyatta, some union representatives, and other managers who were on duty that day. Wright's impression was that everyone had been trying to make sure their stories were consistent. Wright told Wagner that he "didn't like the tone" of the meeting because "[i]t wasn't facts." (*Id.* at 131.) When Wagner asked Wright for more details, Wright admitted that he was not a party to the conversation and that he did not know what had been said. Wagner confronted O'Connell, Kenyatta, and Wells with Wright's allegation that they had been trying to coordinate their stories. They stated that they were merely discussing calling the police and "what actions to take next." (*Id.* at 134.)

At the end of the investigation, Wagner decided to convert Johnson's suspension into a termination. He terminated Johnson's employment by letter dated May 12, 2008. Johnson's termination letter refers to three allegations regarding her behavior on April 28, 2008: (1) throwing a logbook at O'Connell, (2) shouting and behaving in a threatening manner, and (3) aggressively pushing O'Connell into the wall outside Kenyatta's office. (Dkt. #42-6.) The letter

states that the Koppers's management spoke with Johnson, O'Connell, and other individuals

regarding the incident and that "[i]t appears to the Company, based on those discussions, that

you were, in fact, behaving in an aggressive, hostile and threatening manner on the afternoon of

April 28 and that you did push Mr. O'Connell into the wall of the tar foreman's office as

alleged." (*Id.*)  The letter states that Johnson was terminated because "[s]ince November, 2006

[she had] been trained, counseled, warned and suspended as a result of violations of the

standards of conduct that Koppers rightfully has of its employees" and that she had failed to

change her behavior.  (*Id.*)  O'Connell's allegation that Johnson threw a logbook at him was not

used as a basis for Johnson's termination because no one witnessed the incident.

Eventually an order of protection was issued against Johnson to stay away from

O'Connell.  Johnson was also criminally prosecuted.  On October 27, 2008, the Circuit Court of

Cook County entered a directed finding in favor of Johnson.  The court based its ruling on the

fact that the criminal complaint indicated that the incident had occurred on the wrong date and

that Wells testified, inconsistently with the complaint, that Johnson had pushed O'Connell with

one hand instead of two.  (*See* Dkt. #55-1 at 50.)  It is undisputed that O'Connell has friends on

the Stickney police force.

## IV. Comparators

Johnson has identified two individuals who she claims are similarly situated to her,

although not female or African-American.  The first individual is O'Connell.  In July 2003,

O'Connell and Johnson were in the lab together with Gerba, their supervisor.   When O'Connell

attempted to sit down before Johnson could finish her tests, Gerba said, "Move, Mike."

(Johnson Dep. at 56–57.)  O'Connell became upset and started "saying things" to Gerba.  He

then took off his plastic lab gloves. One glove fell to the floor. O'Connell threw the other glove and a pen in the direction of Johnson and a garbage can that was located between Johnson and Gerba. The glove landed on the floor, about one foot in front of Johnson. The pen "flew towards" Gerba. Johnson believed that he was aiming for her when he threw the pen and glove. O'Connell then walked out of the lab. Gerba witnessed the incident, and sent O'Connell home for the day but did not otherwise discipline him. Gerba testified that he probably reported the incident to Traczek, although he had difficulty remembering whether Traczek or another Koppers employee was the plant manager at the time.

In January 2006, Rosalind Morris, a union representative, told Johnson that O'Connell had told her that he "could have [Johnson] killed if [he] wanted to." (Johnson Dep. at 75.) Johnson didn't report the comment because she didn't think that it was significant. (*Id.* at 76–77.) Later that day, O'Connell approached Johnson and told her, "You know I can have you killed if I wanted to." (*Id.* at 81.) Johnson reported O'Connell's threat to the Stickney Police Department and to Gerba. Gerba told his supervisor, Traczek, about the threat and then interviewed O'Connell. O'Connell denied that he had threatened Johnson. Gerba told O'Connell that "whether [he] said it or not, we can't have things like that around here. It's not tolerated." (Gerba Dep. at 34–35.) Traczek also talked to O'Connell and told him that threats were "unacceptable" and that he expected that O'Connell would "never do it again." (Traczek Dep. at 34.) O'Connell was not formally disciplined.

The second comparator is Steve Wass, a white shift supervisor. Wass was accused of grabbing an African-American employee to prevent the employee from walking away while he was giving him directions for the evening shift. The African-American employee reported this

incident to the plant manager and the union filed a grievance. Wass did not receive any discipline.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the nonmoving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

Johnson may establish sex and race discrimination using either the direct or the indirect method of proof. *See Scaife* v. *Cook Cnty.*, 446 F.3d 735, 739 (7th Cir. 2006) (citing *McDonnell*

*Douglas Corp.* v. *Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 36 L. Ed. 2d. 688 (1973)).[3]

Koppers argues that it is entitled to summary judgment because Johnson has not presented direct

or circumstantial evidence of discrimination under the direct method of proof and, alternatively,

because Johnson cannot establish a *prima facie* case of discrimination under the indirect method

of proof. Even if Johnson can establish a *prima facie* case, Koppers argues, she has not

produced evidence of pretext. Johnson argues that summary judgment should be granted in her

favor under the direct method of proof and that genuine issues of material fact exist under the

indirect method of proof such that summary judgment in favor of Koppers is inappropriate.

## I.    Direct Method of Proof

Johnson asserts a claim under the "cat's paw" theory of liability. *See Shager* v. *Upjohn*

*Co.*, 913 F.2d 398, 405 (7th Cir. 1990). The phrase "cat's paw" refers to the fable where a

conniving monkey persuades an unintelligent cat to fetch roasting chestnuts from a fire.

*Schandelmeier-Bartels* v. *Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011). The cat burns

its paw in the process, but the monkey gets the chestnuts. *Id.* In the employment discrimination

context, "the 'cat's paw' is the unwitting manager or supervisor who is persuaded to act based on

another's illegal bias." *Id.* Thus the theory links "an employment decision made by an unbiased

individual and the impermissible bias of a non-decisionmaking co-worker." *Id.* Accordingly, a

plaintiff's evidence of the biased employee's discriminatory animus can provide direct evidence

of discrimination sufficient to defeat her employer's motion for summary judgment. *See Shager*,

---

[3] The court analyzes Johnson's section 1981 claims in the same manner as her claims brought under Title VII. *See, e.g.*, *Bratton* v. *Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir. 1996).

913 F.2d at 402. Johnson's theory is that O'Connell was the monkey and Wagner the unwitting cat.

Koppers argues, as a threshold issue, that an employer may only be held liable under the cat's paw theory where the adverse employment action is caused by a supervisor's discriminatory bias. Because O'Connell was Johnson's co-worker, with no supervisory authority, Koppers concludes that Johnson's theory of liability must fail. In support, Koppers cites *Staub* v. *Proctor Hospital*, --- U.S. ----, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011), which holds that a plaintiff seeking to establish cat's paw liability need only demonstrate that a biased employee's actions were the "proximate cause" of the ultimate employment action.[4] *See* 131 S. Ct. at 1194. The biased employee in *Staub* was a supervisor, and the Court reasoned that "[s]ince a supervisor is an agent of the employer, when he causes an adverse employment action the employer causes it; and when discrimination is a motivating factor in his doing so, it is a 'motivating factor in the employer's action,' precisely as the text requires." *Id.* at 1193 (quoting 38 U.S.C. § 4311(c)).[5] The Court expressly declined to consider whether an employer would be held liable if a co-worker, rather than a supervisor, acted with discriminatory animus and caused the adverse employment action. *Id.* at 1194 n.4. Therefore *Staub* neither precludes nor endorses the legal principle propounded by Koppers.

---

[4] Previously, some Seventh Circuit cases had suggested that an employer could only be held liable if the biased employee had a "singular influence" over the decisionmaker. *Schandelmeier-Bartels*, 634 F.3d at 379 (citing cases).

[5] *Staub* examined the anti-discrimination provision in the Uniformed Services Employment and Reemployment Rights Act, which is very similar to Title VII. *See* 131 S. Ct. at 1190–90. Courts have subsequently looked to *Staub* for guidance in explaining cat's paw liability in the Title VII context. *See* *Cook* v. *IPC Int'l Corp.*, --- F.3d ----, 2012 WL 739303, at *3 (7th Cir. Mar. 8, 2012).

The Seventh Circuit has not addressed whether the biased employee must be a supervisor, rather than a co-worker, but it has suggested in dicta that the distinction is not significant. Most recently, Judge Posner explained:

> In employment discrimination law the "cat's paw" metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action. So if for example the subordinate has told the supervisor that the employee in question is a thief, but as the subordinate well knows she is not, the fact that the supervisor has no reason to doubt the truthfulness of the accusation, and having no doubt fires her, does not exonerate the employer if the subordinate's motive was discriminatory.

*Cook* v. *IPC Int'l Corp.*, --- F.3d ----, 2012 WL 739303, at *3 (7th Cir. Mar. 8, 2012). The example's use of the word "subordinate," rather than "supervisor," undermines Koppers's argument that the employee with discriminatory animus must be a supervisor and not a co-worker. *See also Wallace* v. *SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997) ("There is only one situation in which the prejudices of an employee, *normally a subordinate but here a coequal*, are imputed to the employee who has formal authority over the plaintiff's job. That is where the subordinate, by concealing relevant information from the decisionmaking employee or feeding false information to him, is able to influence the decision." (emphasis added)); *Willis* v. *Marion Cnty. Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997) ("As the district court recognized, *there can be situations in which the forbidden motive of a subordinate employee can be imputed to the employer* because, under the circumstances of the case, the employer simply acted as the 'cat's paw' of the subordinate." (emphasis added)). Moreover, if the biased employee's motive is imputed to the supervisor, then it would not matter whether the biased employee is another supervisor or, as here, a co-worker. In either scenario, a supervisor

13

who is an agent of the employer has caused an adverse employment action that is motived, in part, by discriminatory bias. *Compare with Staub*, 131 S. Ct. at 1193. Taking the foregoing into account, Johnson will not be precluded from asserting a claim based on a cat's paw theory of liability simply because O'Connell was a co-worker and not a supervisor.

Johnson must still present some evidence of O'Connell's discriminatory animus, however. *See Eiland* v. *Trinity Hosp.*, 150 F.3d 747, 751–52 & 752 n.1 (7th Cir. 1998) (summary judgment should be granted for employer where employee fails to provide evidence of discriminatory animus); *Shager*, 913 F.2d at 402 (considering evidence of bias before turning to analysis of cat's paw liability); *Palermo* v. *Clinton*, No. 08 CV 4623, 2011 WL 1261118, at *7–8 (N.D. Ill. Mar. 31, 2011). She argues that a jury could infer that O'Connell was motivated by discriminatory animus because O'Connell falsely claimed that she called him a "white motherfucker" and a "faggot insulin dick." Johnson asserts that because "people often accuse others of what they themselves are guilty," O'Connell's attribution of racial and gender-based epithets to Johnson demonstrates that he, in fact, was racist and sexist.

While it is true that ambiguous statements may provide evidence sufficient to survive a summary judgment motion, *see Shager*, 913 F.3d at 402, O'Connell's accusations do not suggest that he harbored animosity towards women or African-Americans. Johnson cites only one case where a court concluded that the nature of an employee's false accusations provided evidence sufficient to support an inference of discriminatory animus. In *Oakstone* v. *Postmaster General*, 332 F. Supp. 2d 261, 271 (D. Me. 2004), a female employee falsely accused her ex-boyfriend, also a co-worker, of assaulting her in a parking lot, pushing her down, and dragging her across the lot. She also claimed that he had subjected her to an abusive relationship and that she was

14

afraid of him.  *Id.*  The court rejected the employer's argument that these accusations did not constitute evidence of sex-based animus on the grounds that a jury could reasonably conclude that the accuser, "as a female, was making a charge against [her co-worker], as a male, [that] she knew would trigger an immediate and irreparable consequence for him, due to a stereotype about his gender."  *Id.* at 271–72.  The court's conclusion was premised on the legal principle, derived from Eleventh Circuit case law, that Title VII protects employees who are subjected to "gender-based" means for revenge in "failed romance cases."  *Id.* at 271.  Apart from the fact that *Oakstone* is not binding and does not apply the law of this circuit, O'Connell's accusation that Johnson called him a "white motherfucker" and a "faggot insulin dick" cannot be reasonably characterized as utilizing a "stereotype" about Johnson's gender or race.  Johnson has cited no other conduct or comments that might indicate that O'Connell's animosity was motivated by discriminatory animus.  Because Johnson has not cited any evidence that O'Connell's animosity was based on her race or gender, her cat's paw claim cannot succeed.

## II.     Indirect Method

Under the indirect method, Johnson must first make out a *prima facie* case for discrimination by showing that (1) she is a member of a protected class, (2) she met Koppers's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not in the protected class were treated more favorably.  *See Scaife*, 446 F.3d at 739.  Koppers does not contest that the first and third elements of Johnson's *prima facie* case are satisfied.  Once Johnson has established a *prima facie* case, there is a presumption of discrimination.  "The burden must then shift to [Koppers] to articulate some legitimate, nondiscriminatory reason" for its action.  *McDonnell Douglas*, 411 U.S. at 802.  Johnson must

then rebut Koppers's rationale "by presenting evidence sufficient to enable a trier of fact to find that the . . . proffered explanation is pretextual," which gives rise to the inference of discrimination. *Peele* v. *Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002).

Koppers argues that Johnson cannot demonstrate that she was meeting its legitimate expectations because she was disciplined five times prior to April 2008. There is no evidence, however, that Johnson was not adequately performing her duties as a lab technician at the time of her termination. In addition, where a plaintiff alleges that similarly situated employees were disciplined less harshly, usually the "legitimate expectations" prong and the "similarly situated" prong merge. *See Weber* v. *Univs. Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010) (citing *Pantoja* v. *Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007); *Peele*, 288 F.3d at 329)).

Johnson asserts that she was treated more favorably than O'Connell and Wass, two white male employees. To be similarly situated, O'Connell and Wass must be "directly comparable" to Johnson "in all material respects, but they need not be identical in every conceivable way." *Coleman* v. *Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quotations and citations omitted). In cases involving differential discipline, a plaintiff must show that comparators (1) "were treated more favorably by the same decisionmaker," *id.* at 848 (quotation and citation omitted), (2) "were subject to the same standards of conduct," *id.*, and (3) "engaged in similar misconduct," which means that they "engaged in conduct of comparable seriousness." *Id.* at 851 (quotation and citation omitted). A plaintiff must also show that a comparator does not have "such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Weber*, 621 F.3d at 594 (quoting *Peele*, 288 F.3d at 330).

16

Even under this "flexible standard," *Coleman*, 667 F.3d at 846, it is clear that Wass is not an appropriate comparator. There is no evidence that Wass's alleged misconduct was reviewed by the same decisionmakers who were involved in disciplining Johnson. Nor was Wass's misconduct hostile or threatening.

Whether O'Connell was a similarly situated employee is a closer issue, although ultimately this comparison also fails. Johnson argues that O'Connell was treated differently after the 2003 glove and pen throwing incident, the 2006 death threats, and the 2007 radio incident. The 2003 glove and pen throwing incident did not involve misconduct of comparable seriousness. There is no evidence that either object was dangerous. The glove landed on the floor about a foot away from Johnson, and O'Connell immediately left the lab. Neither Johnson nor Gerba testified that the incident was threatening. O'Connell's actions may have been insubordinate and inappropriate, but the record does not support the conclusion that his misconduct was as threatening as Johnson's.

With respect to the 2007 radio incident, there is no evidence that O'Connell engaged in threatening misconduct that went undisciplined by Wagner. Johnson testified that O'Connell "turned down the radio and turned on the air. And I asked him why did he do it. . . . I don't really consider that, you know, an altercation." (Johnson Dep. at 121.) Moreover, both Johnson and O'Connell received the same discipline. Therefore Johnson cannot rely on the 2007 radio incident to show that O'Connell was a similarly situated employee.

O'Connell's threats to Johnson in 2006, on the other hand, were comparably serious to the conduct that gave rise to Johnson's termination in 2008. Both forms of misconduct violated Koppers's written prohibition on threatening behavior. Johnson and O'Connell do not need to

17

have broken the rule in the same manner in order to be similarly situated employees. *See Coleman*, 667 F.3d at 851 (plaintiff who told her psychiatrist she was having thoughts of killing her supervisor was similarly situated to two other employees who had recently threatened another employee at knife-point).

Johnson and O'Connell were disciplined under significantly different circumstances, however. Johnson does not dispute that she had engaged in one prior physical altercation – throwing a stapler when she became angry at a guard – prior to her termination. Because of the stapler incident, Johnson had been suspended without pay for ten days and given a written warning that future instances of similar misconduct would result in termination. O'Connell, on the other hand, had not engaged in prior threatening misconduct. As discussed above, the pen and glove throwing incident is not of comparable seriousness and does not violate the same workplace policy against threatening behavior. Because O'Connell, unlike Johnson, had not previously violated Koppers's policy against threatening misconduct, he is not an appropriate comparator. *See Weber*, 621 F.3d at 594 (employees not similarly situated because there was no evidence that they had violated relevant workplace policies with the same "reckless abandon" as plaintiff); *Amrhein* v. *Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) (employees not similarly situated because, unlike plaintiff, they had not previously engaged in misconduct).

Johnson has also failed to demonstrate that O'Connell was treated more favorably by the same decisionmaker. "Under Title VII, a decisionmaker is the person responsible for the contested decision." *Coleman*, 667 F.3d at 848 (quotations and citation omitted). Gerba disciplined O'Connell after the pen and glove throwing incident in 2003. Gerba's testimony indicates that he might have reported the incident to Traczek, but Johnson does not argue that

18

Traczek was involved in the disciplinary decision. Gerba was also responsible for investigating O'Connell's misconduct in 2006, and the evidence indicates that he and Traczek then determined how to discipline O'Connell. Johnson's misconduct in 2008 was investigated by Wagner, who had replaced Traczek as plant manager. Although Wagner consulted with Traczek during his investigation of the incident, Johnson does not contest that Wagner was the supervisor who decided to convert Johnson's suspension into a termination.[6] (*See* Dkt #54, Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 55.) Nor does Johnson attempt to demonstrate that Traczek, who was apparently consulted about both disciplines, was the person responsible for both decisions. (*See* Dkt. #54, Pl.'s Stmt. of Addt'l Facts ¶ 79.) On this record, the evidence is insufficient to support the inference that the same individual disciplined O'Connell in 2006 and Johnson in 2008. *Compare with Coleman*, 667 F.3d at 848 (same decisionmaker was responsible for both disciplines where supervisor had participated in investigations of plaintiff's misconduct as well as comparators' misconduct and had signed the letters authorizing the relevant adverse employment actions). Because Johnson and O'Connell are not similarly situated employees, Johnson has not established a *prima facie* case.

---

[6] Johnson instead argues that in order to be similarly situated, employees do not need to have the same supervisor so long as they are subject to the same policies and standards. The case she cites in support, *Gary* v. *Carrier Corp.*, No. 04 CV 161, 2006 WL 758456, at *7 (S.D. Ind. 2006) (Hamilton, J.), considered an employer's non-discretionary policy of requiring employees to clock out when they left for lunch. The court noted, however, that the requirement that employees share the same supervisor is important in cases where the adverse employment action is dependent on the judgment of one's supervisor. *Id.* at *7. More recently, in *Coleman*, a case involving termination for threatening misconduct, Judge Hamilton emphasized the importance of demonstrating that similarly situated employees were subject to discipline by the same decisionmaker. *See* 667 F.3d at 848. Johnson's claims deal with an employment decision that was dependent upon her supervisor's judgment and therefore the identity of the decisionmaker is significant to the court's analysis.

Moreover, Johnson cannot demonstrate that Koppers's stated reasons for her termination are a pretext for discrimination. Koppers has offered a legitimate, non-discriminatory reason for terminating Johnson – the pushing incident and her prior warnings regarding aggressive conduct. To establish that Koppers's reasons are pretextual, Johnson must present evidence "suggesting that [Koppers] is dissembling." *Coleman*, 667 F.3d at 852 (quoting *O'Leary* v. *Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered" as to why Johnson was terminated. *Id.* (quoting *O'Leary*, 657 F.3d at 635).

Johnson argues that there is a discrepancy between the facts of the April 28 incident as described in Johnson's termination letter and the facts described by Koppers's witnesses in these proceedings. She cites no specific examples. Presumably, Johnson is referring to the fact that her termination letter states that Johnson pushed O'Connell "into a wall *of the tar foreman's office*," whereas the Wells's testimony indicates that the push occurred in the hallway *outside* the office. This small difference does not undermine Koppers's assertion that Johnson was terminated because she aggressively pushed O'Connell.[7]

Johnson also attacks the accuracy of Koppers's investigation in numerous ways, arguing that (1) Wagner was wrong to reject Wright's theory that there was a conspiracy among various employees to fabricate a common story, (2) Wells's testimony cannot be credited because he needs eyeglasses and may have owed twenty-seven dollars to O'Connell, (3) Wells's testimony

---

[7] Johnson also argues that Koppers's stated reason for terminating her has changed because Koppers now asserts that she was terminated because she failed to heed prior disciplinary warnings, whereas her termination letter mentions prior conduct only "in passing." This argument mischaracterizes the record. Wagner's termination letter to Johnson explicitly references her prior misconduct in November of 2006. (*See* Dkt. #42-6 at KI0000895–06.)

cannot be credited because he has testified inconsistently as to whether Johnson pushed

O'Connell with one hand, or two, and whether the push occurred while Johnson was exiting or

entering Kenyatta's office, (4) Kenyatta's testimony cannot be credited because he is a convicted

sex offender, and (5) Wagner's notes from his interviews with Kenyatta, Wells, and O'Connell

indicate that each employee told a slightly different variation of the same story. Many of

Johnson's arguments are based on information that was not available at the time of the

investigation. To the extent that Johnson's arguments are based on facts from the relevant time

period, they do not indicate that Koppers's stated reasons for terminating Johnson are a lie. The

Seventh Circuit has repeatedly cautioned that "the actual issue is not whether [the employer's]

account of events is correct, rather it is whether [the employer] honestly believed the report of its

officers." *Jones* v. *Union Pacific R.R. Co.*, 302 F.3d 735, 744 (7th Cir. 2002); *see also*

*Kariotis* v. *Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677–78 (7th Cir. 1997). Wagner's

decision not to credit Wright's accusation is reasonable in light of his follow-up with Wells,

O'Connell, and Kenyatta, who denied that they had altered their stories and said that they were

instead discussing what steps to take when the police arrived. Wagner's decision to credit

Kenyatta is also reasonable. Johnson does not argue that Kenyatta's prior conviction would be

admissible impeachment evidence, *see* Fed. R. Evid. 609, or that it somehow suggests that

Kenyatta was biased against her. Finally, the fact that the incident may not have occurred

exactly as O'Connell alleged does not indicate pretext. *See, e.g.*, *Luster* v. *Ill. Dep't of Corr.*,

652 F.3d 726, 733 (7th Cir. 2011) ("[W]hether the incident occurred exactly as described by

Cole does not affect the outcome here."); *Bodenstab* v. *Cnty. of Cook*, 569 F.3d 651, 657 (7th

Cir. 2009) ("[O]ur only concern is the the honesty of [Cook County's] beliefs, and not whether

Bodenstab actually made the specific threats, as claimed by Wengeler." (quotations and citation omitted)). Here, the record supports the conclusion that Koppers conducted a thorough investigation and that its belief that Johnson had threatened and pushed O'Connell was reasonable. This, of course, is the opposite of pretext. *See Flores* v. *Preferred Tech. Grp.*, 182 F.3d 512, 516 (7th Cir. 1999) (while an employer need only supply an honest reason, not necessarily a reasonable one, "the more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held").

Finally, Johnson argues that Wagner was biased against her and that he clearly did not believe O'Connell's accusations because he had previously "classified . . . O'Connell as a false accuser." In support she cites Wagner's July 2007 written verbal warning letter to O'Connell, which merely states in general terms that "[h]orse play, false accusations of others, verbal harassment, and any other type of disruptive behavior needs to stop immediately." (Dkt. #42-4.) The warning letter does not state that O'Connell made false accusations against Johnson. Moreover, Wagner testified that he included the reference to false accusations in the warning because he wanted to make sure that O'Connell understood that false accusations would be taken seriously. He never concluded that O'Connell made false accusations. Nor does the record support the conclusion that Wagner conducted his investigation of Johnson in a biased manner. Indeed, he interviewed Johnson twice during the investigation and based his termination decision upon the only incidents that had been witnessed by third parties.

Taking the foregoing into account, Johnson has failed to demonstrate that there is a genuine issue of material fact using the indirect method of proof. Koppers's motion for summary judgment must be granted and Johnson's motion must be denied.

## CONCLUSION AND ORDER

For the reasons set forth above, Koppers's motion [#47] is granted and Johnson's motion

[#39] is denied.  This case is terminated.

Dated: May 25, 2012                    ENTER: _____

                                                 JOAN HUMPHREY LEFKOW
                                                 United States District Judge